## DEMPSY BROWN et al. *v.* WILLIAM GOOLSBY et al.

1. STATUTE OF LIMITATIONS: A PARTY MADE A DEFENDANT BY AN AMENDED BILL PROTECTED BY THE STATUTE, IF TIME ELAPSED BEFORE FILING AMENDMENT.— The date of the commencement of a suit in chancery, as to a defendant who is made a party by an amendment to the original bill, is the time of the filing of the amended bill, and he will be protected by the Statute of Limitations, if the period prescribed by the statute has elapsed before the amendment is filed.

2. CHANCERY: JURISDICTION: POSSESSION OF SLAVE BY DEFENDANT ESSENTIAL TO A SUIT FOR HIS RECOVERY, OR FOR DAMAGES FOR DETENTION, ETC.—Where the defendant is not in possession of a slave sought to be recovered in equity, either at the time of the filing of the bill or during its pendency, no decree can be rendered against him, either for the delivery of the slave, or for damages for its conversion or detention, although the bill allege that the possession of the slave is in the defendant.

APPEAL from the District Chancery Court at Holly Springs. Hon. James F. Trotter, vice-chancellor.

*Howry* and *Hayes*, for appellants.

Complainants have established beyond controversy their title to the slave Dave. In the court below, this was conceded by defendants, and the Statute of Limitations alone was relied on by them, and on this defence the court made its decree dismissing the bill.

The original bill was filed in the Chancery Court at Holly Springs against Goolsby alone, alleging complainants' title to and Goolsby's possession of the slave.

Complainants had their bill drawn up, and made an affidavit thereto, for the purpose of obtaining an attachment and *injunction*, on the 2d day of February, 1854.

The clerk's indorsement on the bill of the time of its being filed in his office was *November* 25, 1854.

There is no copy of the subpœna in the record, nor any evidence of the precise time of its issuance or service.

Defendant Goolsby's answer to the original bill was filed on the *1st January*, 1855. In his answer, he states that he purchased Dave of Watson *in February*, 1852. That Watson purchased the slave of Bowers about the 1st *December*, 1851, *or thereabouts*.

Ann King died in 1852. One witness says that it was *in January*, and another in the winter of 1852.

Under these facts and circumstances, is Goolsby protected by the Statute of Limitations of three years ?

*From the* 1st *December*, 1851, the·time Watson purchased of Bowers the slave in controversy, to *the 25th day of November*, 1854, the time of the institution of this suit against Goolsby, *three years* had not elapsed. *Ann King died in* 1852, *in January*, holding a life estate in Dave. Complainants were only entitled, under the will, to the possession upon her death. Their right of action then accrued,—that is, in the winter of 1852,—and from that time to the institution of the suit three years had not elapsed, even up to the time when defendant filed his answer.

The proof is, that John King, husband of Ann King, loaned Dave to Daniel Bowers, in the State of North Carolina, from whom these defendants acquired their title. There is no proof that Bowers's possession of the slave in North Carolina or in Mississippi was adverse to Ann King or her husband, or to complainants, and *until the sale made* by Bowers in December, 1851, to Watson, *there was no adverse possession*.

In case of a loan of a chattel, the possession of the *bailee* is the possession of the *bailor*. Story on Bailments, 282, 279.

Adverse possession is *never presumed* from the fact of peaceable possession. Angell on Limitations, 82 to 87.

When there is a bailment of personal property, the possession of the bailee, by intendment of law is held to be the possession of the bailor, and in obedience to this rule, his title and this relationship continues, until the bailor *has notice* of the change of the character of the possession, and that it is hostile to his rights. *Finch* v. *Rogers*, 11 Humph. 561; *Moseby* v. *Williams*, 5 How. Miss. 520; *Porter* v. *Porter*, 3 Humph. 587; Meigs Rep. 427; 6 Humph. 75; 5 Ib. 347; 1 Ib. 198; 3 Yerger, 72.

There is no proof that Bowers claimed the slave in North Carolina, or even in Mississippi, until an act of ownership was exercised in making the sale to Watson. His bare possession, unaccompanied with declarations of claim of ownership, and of which his bailor had notice, would not make his *possession, adverse. There is no statutory bar as to Goolsby.*

Another point arises from his answer. He says, " that the slave is not in his possession," or " that he does not now claim him." That in February, 1854, he resold Dave to Watson, and gave him the possession.

In the joint answer of Goolsby and Watson to the supplementary bill, they say, " that this resale took place *about* the 1st of February, 1854." Affidavit was made to the bill on the 2d February, 1854, and the bill filed 25th November, 1854. Of the complainants' claim, both Watson and Goolsby had notice, by the personal application of Brown to them for the slave. Goolsby then parted with his possession before the suit was brought, *after notice*, and for what purpose ? To baffle the complainants in their attempts to recover by suit.

Under this state of facts, a decree, perhaps, for the specific delivery of the slave, could not properly have been rendered against Goolsby. But, upon general principles of equity, he should have *been held accountable' for the value of the slave*, and for hire whilst in his possession.

In Mississippi, Tennessee, and most of the slave States, equity has concurrent jurisdiction with courts of law, for the recovery of

slaves, without any allegation or proof that the property has any peculiar value, and that damages would not be an adequate compensation, as is required for the specific delivery of other personal property.

At law, for the recovery of the slave, the only form of action would be detinue. And this action of detinue will lie where the defendant has *parted with the possession of the slave before* the institution of the suit for its recovery. *Hawly* v. *Rowan*, 5 Yerger, 501; 3 Monroe, 103 ; 1 Bibb, 186; 1 Dana, 118.

And this is the only form of action where the thing can be recovered in specie. The judgment being for the thing, if to be had, if not, its value and damages for its detention.

In Tennessee, a bill in equity for the recovery of slaves is called by the courts a *detinue bill.* *Pope* v. *Eakin*, 3 Humph. 413.

And the jurisdiction of the courts of law and equity are concurrent. *Murry* v. *Carter*, 20 Johns. 576.

From this analogy of a bill in equity for the recovery of slaves, to an action at law *in detinue*, a like remedy should be granted in each court, and a want of possession by the defendant of the slave, at the time the bill is filed, should not oust the court of its jurisdiction to award compensation.

*Suttle* v. *Suttle*, 10 Humphreys, 478, held, that where a portion of the slaves were sold in Virginia, a bill would be sustained in Tennessee for specific delivery of those in possession, and for *compensation for those sold in Virginia.*

It is a maxim in equity, that its decrees will be adjusted to meet every exigency of the case. 1 Story Equity, 28.

Only in special cases do courts of equity entertain jurisdiction in the assessment of damages or compensation, and the rule is thus laid down by Judge Story :—

" A court of equity, when there is a *plain, adequate,* and *complete* remedy at law, will not entertain jurisdiction to give redress by way of compensation or damages, when these constitute the *sole objects of the bill.* Compensation should be decreed as *incidental* only to other relief sought by the bill, or where there is no remedy at law, or where there is some peculiar equity supervening, as where pending a suit for specific performance, a part of the sub-

ject-matter is abstracted." See also *Philips* v. *Thompson*, 1, Johns. Ch. Rep. 132.

As against Goolsby, compensation only could be awarded, as he has disposed of the property. The object of the bill was the specific delivery of the slave to complainants; as incidental to this relief, its value, when the defendant has, by his own wrongful act, put it out of his power to comply with an order of the court for its surrender, by every principle of equity, and in accordance with the universal practice of its courts, he should be made to account for the value of the slave and for hire, by way of compensation. 2 Story Equity, 29, 722, 796; 12 Vesey, Jr. 395, 418; 1 Ib. 329; 1 Johns. Ch. 132.

Is the character of such a demand changed by the facts of this case? the bill being marked filed by the clerk at a time subsequent to the delivery by Goolsby to Watson.

Both the defendants, Goolsby and Watson, in their joint answer, state "that *they had heard a rumor* some time before Brown came to this State in 1854, that some persons in North Carolina were claiming the boy Dave, and were threatening to come or send to Mississippi and sue for him." "That it was rumored that Dave was entailed property." Respondents both learned, about the 1st February, 1854, that said Brown was in Oxford, and that he came to sue for Dave. That they both went to Oxford and found Brown, who told them he came for Dave.

Respondents talked the matter over before they got to Oxford, and as Goolsby was unwilling to hold the boy Dave under a doubtful title, they agreed that they would *exchange negroes*, which was perfected in a few days afterwards. No money passed between them. All this took place after they had notice of the claim of Brown and others.

Complainants' bill is drawn up and sworn to on 2d February, 1854, and the defendants hear on 1st February *he is in Oxford. They go to town*, find him there, receive the notice of the complainants' claim to Dave. The *rumors* are now confirmed; the bill is drawn up and sworn to, and *Goolsby becomes alarmed*. The complainant does not know the state of their minds, nor do they apprise him of their intentions. He could not know which of them, at the time of filing the bill, had the actual possession of Dave, or

what they intended to do with him. His fears were that they would run him; he speaks in his charges, from information. It seems, instead of running him, they chose the plan of shifting the possession, and keeping complainant in the dark. And the possession is actually changed, as they acknowledge, after they return from Oxford, *some days*, being several *days after about the* 1st *of February.*

If the jurisdiction of a court of equity and the equitable rights of parties can be defeated by the conduct of parties, as detailed by the defendants themselves in their answers, then it would almost seem that it is not deserving the name of a court of equity.

A defendant is told that he is about to be sued. He knows the suit cannot be brought until a judge is found to grant the extraordinary writs, and the court not being held at the place of their residence, but in a distant county; and with a full knowledge of these facts, *they agree to change the possession*, without apprising the complainant of their acts or intention, and he never knew it, until they disclose it by their answers to original and amended bill.

By the rigid rules of law, in detinue, a court would award the value of the slave against Goolsby, under these facts. And should not a court of equity, where conscience presides, do the same, the jurisdiction being concurrent? And where an act is prohibited from being done, by the fraudulent conduct of another, equity will regard its commission as fraudulent, and give relief.

By the *secret* and *fraudulent* arrangement between these defendants, there was a change of the possession of the slave before the bill was filed, and Goolsby should in equity, for the purpose of jurisdiction, be regarded as having the slave in possession.

Fraud is so abhorrent to courts of equity, that where a full price is paid for property, if the intention was designed to defeat a creditor, it is *fraudulent and void*. *Trotter* v. *Watson*, 6 Humph. 514.

It is preposterous to suppose that suit would have been brought against Goolsby for the recovery of the slave, if it had been known by the complainants that Watson was then in possession, the object of the bill being a recovery in specie.

When was this fact made known? Not until Goolsby *discloses* it in *his answer, filed* 1st *February*, 1855, and from this time to 8th August, 1856, when Watson was made a party by supplemental

bill, three years had not elapsed; consequently Watson is not protected by the Statute of Limitations.

In cases of a fraudulent concealment of the cause of action, the statute does not commence running until the fraud is discovered. Angell on Lim. 190 to 196; 2 Greenlf. Ev. 363, and notes.

The filing of the bill is the commencement of the action. Angell on Lim. 321–325; Greenlf. Ev. 349.

The statute does not bar a remainder-man in slaves, until *six years* after the *termination of the particular estate.* 4 How. Miss. 204.

By the laws of North Carolina, a sale or gift of a slave must be in writing, or it is void. 11 Humph. 561; 8 Yerger, 145; 4 Ib. 507; 6 Humph. 75.

There is a peculiar equity in this case, and there is no remedy at law. If the decree dismissing the bill is sustained, then *all* remedy at law is barred by the Statute of Limitations against Goolsby and Watson and Bowers, although Watson has only paid to Bowers $75 of the purchase-money which he agreed to pay.

"It is well settled," says Chief Justice Marshall, "that when the jurisdiction of a court of equity once attaches, the court will go on and do complete justice, although in its progress it may decree on a matter which was *cognizable at law.*" *Cathcart* v. *Robinson*, 5 Peters, 278.

There is a special interrogatory in the bill, to wit: "If defendants, or either of them, were not advised, or had notice of the proceedings in equity for the recovery of Dave before the resale by Goolsby to Watson?"

There is no response to this interrogatory, which is conclusive evidence that the slave was in Goolsby's possession at the time the first proceedings were taken.

Watson, in his answer, says, *and even fiercely charges*, that "at the interview at Oxford, about the 1st of February, 1854, he informed Brown that the slave was in his possession."

*There is no proof of this fact,* nor is it responsive to any charge in the bill; and it is also inconsistent with the statement of both parties made in their answer, to wit, that on their way to Oxford they agreed upon a resale of Dave, *but it was not completed until*

*some days* afterwards by payment, which was *an exchange of negroes.*

*The truth is,* as charged in the bill, " that prior to the 2d February, 1854, Brown called on Bowers, who then told him he had sold the slave to Watson. He then called on Watson, who told him he had sold him to Goolsby." Goolsby, in his original answer, did not deny that Brown had called on him and demanded the slave, nor does he say that the slave was not in his possession. If Brown had been informed that Goolsby had parted with the possession of the slave, it is preposterous to suppose that he would have instituted these proceedings against him for the *specific* delivery of the slave.

A principle has been declared by the Supreme Court of Tennessee, which, if adopted by this honorable court as sound law, is conclusive against Goolsby.

In *Sharp* v. *King,* 6 Humph. 56, " A. purchased of the tenant for life, a slave, and with full knowledge of the rights of those entitled in remainder, sold the same to B. before the bill was filed against him. *Held,* that A. was a *quasi* trustee for the remainder-man, and was guilty of a fraudulent breach of trust, and was in equity liable for the value of the slave."

In this case, Goolsby had full knowledge of the rights of complainants before his recantation of the trade with Watson, and before redelivery of the slave, after they went home from Oxford from their interview with Brown.

A reversionary interest or remainder-man is not to be prejudiced by any act or default of the person having the life estate. See act, Hutch. Code, 615.

In this case, the loan by Ann King to Bowers's wife, of Dave, was not a gift, nor should it affect the rights of the remainder-man. The proof is clear that it was not a gift, nor was their possession adverse, but they hold for the heirs now claiming.

*H. A. Barr,* for appellees.

Goolsby sold and delivered Dave, the slave in controversy, to Watson, in February, 1854, and the original bill was not filed against him until the 25th November, 1854. It will not be pretended that a bill for the *specific delivery of a slave in specie,* can be sustained against a party who is not in possession of the slave

when the bill is filed. Hence, complainants cannot recover as against Goolsby.

Watson is protected by the Statute of Limitations. Ann King held a life estate in the slave. Her husband, John King, died in August, 1849, and she died in January, 1852. The right of action of complainants accrued at the date of the death of Ann King. The supplemental bill, by which Watson was made a party to the suit, was not filed until the 7th August, 1856. The statute run in favor of Watson until he was made a party by the supplemental bill. *Miller* v. *McIntyre*, 6 Peters Rep. 61.

It makes no difference that some of the complainants are infants. If one of several persons entitled to a joint action be capable of suing at the time the cause of action accrued against the defendant, and the suit be not instituted within the time limited by the statute, all will be barred. This is the rule both at law and in equity. *Jordan et al.* v. *McKenzie et al.*, 1 George Rep. 35.

The possession of Dave by Bowers and wife commenced in 1847 or 1848. John and Ann King *gave* Dave to Mrs. Bowers, and Bowers and wife sold him to Watson in 1851. The gift to Mrs. Bowers was sufficient to authorize her and her husband to claim title, and the sale to Watson shows that they did claim title. Their possession was therefore adverse. Watson sold Dave to Goolsby in 1852, and Goolsby resold him to Watson in 1854. Kennedy proves that Goolsby had him in his possession in the spring of 1853. Clearly the possession of Goolsby and Watson was adverse, for more than three years between the time of the death of Ann King and the date of the filing of the supplemental bill. It makes no difference that neither of them had him in possession for the entire period of three years. It is immaterial whether the possession be held for the entire period by one party, or by several parties in succession. *Benson* v. *Stewart et al.*, 1 George Rep. 57.

There is no *legal* proof that Dave is one of the descendants of Abigail. John Dorsett is the only witness who professes to know anything about the increase of Abigail. In his answer to fourth interrogatory in chief, he says that Eliza is one of the increase of Abigail, but on cross-examination, when he is asked to state particularly how or by what means, or in what way he is enabled to know the mother of Eliza, he says, " I have always understood that

Abigail was the mother of Eliza." From whom did he "understand" it? The rule is, that the witness must learn it from deceased members of the family to which the person whose pedigree is in question belonged. And it is essential that the witness should give the name of the member of the family from whom he obtained his information. *Chapman* v. *Chapman*, 2 Conn. Rep. 347; *Waldron* v. *Tuttle*, 4 N. H. Rep. 371; *Gregory* v. *Baugh*, 4 Rand. 616; *Elliot* v. *Piersol*, 1 Peters Rep. 337; 1 Greenl. Ev. sec. 103.

There is no proof that complainants are the children of Ann King, lawfully begotten of her body, &c. No witness is asked whether complainants are the children of Ann King. Some of the witnesses incidentally speak of them as the heirs of Ann King. If this could be regarded as testimony at all, it is not competent testimony. Witnesses can only state the facts, and the court must decide upon those facts, the question of heirship. But proof that complainants are heirs of Ann King is not evidence that they are her children. They may be collateral heirs.

HANDY, J., delivered the opinion of the court.

This bill was filed by the appellants on the 25th November, 1854, in the District Chancery Court of Holly Springs, to recover possession of a slave, the property of the appellants, alleged to be in the possession of the appellee Goolsby, and hire for the detention.

The bill alleges, in substance, that the mother of the appellants, having a life estate in the slave in the State of North Carolina, loaned the slave to one Bowers in that State, who brought him to this State, and fraudulently sold him to one Watson, who sold him subsequently to Goolsby. That the appellants' mother died in the winter of the year 1852, at which time the title to the slave vested in the appellants.

Goolsby answered, admitting that he purchased the slave from Watson in February, 1852, but denying he was in his possession, or that he had had possession of him since February, 1854, at which time he resold the slave to Watson; and setting up the Statute of Limitations of three years as a defence.

In August, 1856, the appellants filed an amended bill, making Watson a party, alleging that since the filing of the original bill, they had discovered that Goolsby had sold the slave to Watson in

February, 1854, and charging that the resale to Watson was made because the appellees had notice of the appellants' rights, and by fraudulent combination, to change the possession of the slave from Goolsby to Watson, before this bill was filed against Goolsby.

The answers substantially admit that the appellees had notice about the time of the resale to Watson of the appellants' claim, and that the slave was returned by Goolsby to Watson, who gave Goolsby another slave in his place, Goolsby's reason for returning the slave being that he did not wish to have a slave with a doubtful title. They deny all fraud, and set up the Statute of Limitations of three years as a defence.

Upon the hearing, the bill was dismissed, and from that decree this appeal was taken.

1. As to Watson, it appears that the appellants' right of possession accrued about the month of January, 1852, and that about the same time Watson purchased the slave and took him into possession, claiming title. The amended bill, by which he was made a party, was not filed until August, 1856, and until that time the suit cannot be considered as having been commenced against him. There was then a period of more than three years since the accrual of the appellants' right of action against Watson, and also more than three years since the commencement of his adverse possession, which was still continued. The suit was, therefore, clearly barred as to him by the statute, and on this ground the bill was properly dismissed as to him.

2. The Statute of Limitations is not a bar as to Goolsby, because less than three years had intervened between the time of accrual of the appellants' right of possession and the time of filing the original bill against him.

But it appears by the pleadings that the slave was not in the possession of Goolsby at the time of filing the original bill, nor at any subsequent time; and that is relied on as a reason why the relief sought by the bill cannot be decreed against him. The question is thus presented, whether a party entitled to the possession of a slave can maintain a bill in equity against a defendant who has previously had possession of the slave, and converted him to his use by sale, or otherwise parting with the possession, but is out of pos-

session at the time of filing the bill and during the pendency of the suit.

It is clear that no decree can be had against the defendant in such a case for the delivery of possession of the slave, because the slave is out of his possession and beyond his control; and as such a decree would be to require an impracticable act, it would be nugatory, and the owner would have to resort to the person in whose possession the slave might be found.

But can the owner maintain such a bill to recover damages for the value of the slave against the defendant, who has sold him and parted with possession before the institution of the suit, by analogy to the action of detinue at law?

The numerous cases in which bills in equity for the recovery of possession of slaves have been entertained, proceed upon the general principle that slaves are a species of property of peculiar value to the owner, which cannot be adequately compensated in mere damages for their loss; and, therefore, that the owner is entitled to invoke the extraordinary powers of a court of equity to enable him to have the slave restored to him in specie, by the party in whose possession he may be found. The very principle and necessity of the jurisdiction is, to compel and insure a delivery by the person holding possession to the party entitled to the possession. And hence, possession by the defendant at the time of the institution of the suit, or during its pendency, is a necessary jurisdictional fact, without which the very object of the proceeding would fail. For if the suit could be maintained merely for the recovery of damages for the conversion or detention of the slave, it is manifest that that would be the same remedy which existed at law,—a decree in equity for money, instead of a judgment at law for the same amount, and to be collected in the same manner in each forum. And because there is an adequate remedy at law, upon familiar doctrine, the owner cannot have relief in a court of equity. There cannot be a doubt but that this is true with reference to a suit in equity brought solely for the purpose of recovering damages for the conversion or detention, the slave not being in the defendant's possession.

Is the case different where the bill alleges that the slave is in the defendant's possession, and seeks a recovery in specie and hire, and the fact is that the slave is not in the defendant's possession? We

think not; because the main jurisdictional fact of possession is wanting. It is that fact which gives the jurisdiction in equity, and without it the jurisdiction must fail both as to delivery of possession, which is the principal, and the decree for damages for detention, which follows as an incident. But the incident cannot give jurisdiction without the principal. Such a bill would simply be, as to the possession, a suit brought against the wrong person, and would be, in that respect, as though it had not been brought to recover possession; and it would then stand in effect upon the ground of a mere bill to recover damages for conversion or detention. The case is not different in principle and upon the point under consideration, from the action of replevin, to which it bears a stronger analogy than to any other action at law. No recovery could be had in that action for damages against a party not in possession at the institution of the suit, the possession being the very ground of the action; and there is as great a necessity for possession in the defendant in a bill like this, as in the action of replevin.

For these reasons, we are of opinion that where the defendant is not in possession of a slave sought to be recovered in equity, either at the time of the filing of the bill or during its pendency, no decree can be rendered against him, either for the delivery of the slave or for damages for his conversion or detention, though the bill allege that the slave is in the defendant's possession.

And accordingly, the decree in this case must be affirmed.