# APRIL TERM, 1866.

## CATHARINE E. SCOTT, *v.* JOSEPH BILLGERRY.

1. CONQUERED TERRITORY: POWER OF PRESIDENT TO CREATE GOVERNMENTS FOR.—
The President of the United States has the power to create a government for
conquered territory, and he may delegate the power to another. The power
must be exercised according to the controlling provisions of the Constitution of the
United States. Handy, C. J., dissented, as to the restriction upon the exercise of
the power.

2. SPECIAL COURT OF EQUITY: UPON THE THEORY, THAT THE STATE OF MISSISSIPPI
WAS CONQUERED TERRITORY, THE PROVISIONAL GOVERNOR HAD POWER TO
CREATE.—The State of Mississippi, after the close of the war between the United
States and Confederate States, being held, *according to the theory of the Federal
Government,* as conquered territory, and the State government being abolished by
force of arms, the President of the United States, upon the assumption that the
State was conquered territory, had the power to appoint a provisional government
therefor, and the government so created had the authority to establish tribunals
for the administration of the laws, subject to the restrictions and general princi-
ples of the Constitution of the United States. Handy, C. J., dissented, as to the
restrictions upon the exercise of the power.

3. SPECIAL COURT OF EQUITY: SOURCE OF JURISDICTION, AND EXTENT OF, HOW DE-
TERMINED.—The Special Court of Equity derives its jurisdiction from the procla-
mation of the provisional governor creating the court, and the extent of its
jurisdiction is to be determined by a fair and reasonable interpretation of its
language.

4. SPECIAL COURT OF EQUITY: JURISDICTION OF.—The Special Court of Equity has
the jurisdiction properly belonging to a court of equity for the specific perform-
ance and recision of contracts respecting cotton and other personal property, and
in the discharge of its functions, it is to be regulated by the rules and powers, that
legitimately belong to courts of equity, as recognized in the jurisprudence of this
country. Handy, C. J., dissenting, held.—That the court had jurisdiction to decree
specific performance and recision of *all* contracts respecting cotton and other perso-
nal property.

5. COURTS OF EQUITY: JURISDICTION TO DECREE SPECIFIC PERFORMANCE OF
CONTRACTS RESPECTING PERSONAL PROPERTY, AND COMPENSATION IN DAMAGES.
—Courts of Equity will not interfere to decree specific performance of agreements
respecting personal property, unless, under the particular circumstances of the
case, the remedy at law is not full and complete; nor will they entertain jurisdiction
to give redress by way of compensation in damages, only where the relief is
ancillary to other relief sought and granted by the Court, or where there is no
adequate remedy at law, or where some peculiar equity intervenes.

6. SPECIAL COURT OF EQUITY: JURISDICTION OF: CASE IN JUDGMENT.—Appellee, in the Special Court of Equity, at Jackson, filed his petition, alleging, that appellant sold him seventy-five bales of cotton for $3,900. That the money was paid at the time, and the cotton was to be delivered at Rodney. That appellant refused to deliver said cotton, and prays for a specific performance of the contract. Held—That the case as presented by the petition was not such an one as courts of equity would enforce by a decree of specific performance, and that the Special Court of Equity had no jurisdiction. Handy, C. J., dissenting.

7. TRIAL BY JURY: CONSTITUTIONAL PROVISION IN REFERENCE TO: RIGHT OF, INVIOLATE, AS TO ALL MATTERS COGNIZABLE IN COURTS OF LAW.—The seventh amendment to the Constitution of the United States, which provides, "that in all cases at common law, where the amount in controversy exceeds $20, the right of trial by jury shall be preserved," refers to that class of right properly cognizable in a court of law, as distinguished from a court of equity, and in all matters, over which courts of law have properly exclusive jurisdiction, the right of trial by a jury cannot be impaired by legislative or executive enactment. Handy, C. J., dissenting, held—That this provision of the constitution had no application to courts of equity; that it does not inhibit the enlargement of the powers of courts of equity, by competent legislative authority, so as to embrace matters which were formerly cognizable in courts of law, and that it had no application to the state of things existing in Mississippi when the Special Court of Equity was established, and only to the courts of the Federal Government.

8. CONTRACT: BREACH OF, WHEN CAUSED BY THE ACT OF THE OTHER CONTRACTING PARTY.—A party to an agreement, who, by his own act, has deprived the other contracting party of the means of complying with the stipulations of the agreement, cannot complain of such non-compliance.

APPEAL from Special Court of Equity at Jackson. Hon. Geo. T. Swann, judge.

The facts of the case will be found in the opinion of Mr. Justice Ellett.

*Fulton Anderson* and *E. H. Hicks*, for appellant.

The brief of counsel as to the jurisdiction of the Special Court of Equity, is not on file.

*T. A. Marshall* and *W. Yerger*, for appellee.

ELLETT J. delivered the opinion of the court.

On the 24th of July, 1865, the appellee filed his petition, in which he alleged that on the 3d day of October, 1863, the appellant, by her agent, A. W. Killingsworth, sold to petitioner,

for the sum of $3,900, then paid, seventy-five bales of cotton, averaging four hundred pounds per bale, which cotton was to be delivered, when required, in good order, at Rodney. That the contract for the sale of said cotton was reduced to writing and signed by defendant, by her agent aforesaid. That defendant, although often required, refuses to deliver said cotton; and prays that defendant may be decreed specifically to perform said contract, and for general relief.

The answer, filed August 16, 1865, admits that the defendant did, about September or October, 1863, by her agent, Killingsworth, sell and deliver to said petitioner seventy-five bales of cotton, then under a shed about two hundred yards from her house, at the price of thirteen cents per pound, in Confederate money, there being at the time ninety-one bales under said shed. That he represented himself as a French subject, and was not afraid of the United States or Confederate States burning his cotton; he would make them responsible, if they did. He brought and put a French flag over his cotton, and it remained there until the cotton was burned by order of Gen. Wirt Adams, in December, 1863. Defendant was ordered by Lieut. Robert Tucker, of Adams' cavalry regiment, to roll Billgerry's cotton from under the shed, in order that it might be burned. That her agent Killingsworth came, took the hands, and rolled out seventy-five bales, which were then burned by order of Gen. Adams, as Billgerry's cotton. That Lieut. Tucker gave her a certificate of the burning. That there were sixteen bales left under the shed; that she was ordered by Tucker to roll out plaintiff's seventy-five bales, or he would burn the whole. That in March or February, 1864, petitioner came to her house, and demanded his cotton. He had a military force with him known as the Marine Brigade. She told him the cotton had been burned, and offered to show him the certificate. He pressed two of her wagons and teams, and, with said military, took and carried away the sixteen bales left under the shed, and also twenty-three bales from the gin, which he had never before seen. These thirty-nine bales were taken by him to Rodney and shipped to Natchez, where she followed

it and had it seized; but it was given up to petitioner, and she never received a cent for it. That there was a written contract of sale, which provided that, if petitioner's cotton was burned by military force of either side, it should be petitioner's loss, which specification was on the back of the bill of sale.

A copy of Lieut. Tucker's certificate is filed as exhibit A, in these words :—

DEC. 20, 1863.

I do hereby certify that I have this day burned, by the order of Brigadier-General Adams, (75) seventy-five bales cotton belonging to J. Billgerry, purchased by him from Catherine E. Scott.

(Signed)                     ROBERT TUCKER,
            2nd Lieut. Co. F. Adams' Cavalry Regiment.

On the hearing of the cause, on the 25th day of October, 1865, petitioner filed his affidavit that the written contract had been lost or mislaid; that it was placed in the third District Court in New Orleans, in some legal proceedings had therein, and upon applying for it, and after search made, it could not be found; and that it was not in his possession or control, nor did he know where it was.

A. Blair, for petitioner, testified that—From December 1, 1863, to June 1, 1864, he was clerk in the government yard at Natchez, *but was not clerk in December*, 1863, *only afterwards.* He was sent to Rodney by the treasury agent, about the beginning of March, 1864, to see what amount of government cotton was sent out from the interior. He met Billgerry and Killingsworth at Rodney. The latter demanded of the former a receipt for cotton, which he, as agent of Mrs. Scott, had delivered to appellee. The amount was about seventy or eighty bales. At the same time, Killingsworth asked appellee, " have you weighed the cotton which was sent here ? give me a receipt for it." Thinks the amount sent to Rodney was thirty-five or forty bales, for which Killingsworth demanded a receipt. Appellee answered, " there is no scale here ; the cotton must be shipped to Natchez ; the same will be weighed there, and I will give credit for every pound."

This cotton was shipped to Natchez, by Clemens, to the government yard, where it was claimed by Killingsworth for Mrs. Scott, after witness heard from Drake that he had purchased that cotton from Killingsworth, which the latter admitted. Is certain Killingsworth said the cotton came from Mrs. Scott's, and was a part of the cotton sold to Billgerry. He proves the handwriting of Drake to a letter annexed to his deposition, and states that Drake and Crawford shipped the cotton from Natchez to New Orleans and Cincinnati, according to the statements of Drake and Killingsworth. The cotton was marked " Scott " and " B." He understood from them that Clemens, who shipped the cotton from Rodney, had a share or profit in the same cotton.

On cross-examination, he denied any interest in the suit, and said there were several persons present at the conversation in Rodney, but only remembers Joseph Kraemer, a United States detective police officer.

Joseph Kraemer testified that—He was a detective officer of the United States, from December, 1863, to June, 1864. In February or March, 1864, at Rodney, Killingsworth stated to witness that the Marine Brigade brought out from the plantation of Mrs. Scott, *thirty-nine bales of cotton, which were part of the cotton which he, as agent of Mrs. Scott, had sold to appellee;* and he further stated to witness, *that the cotton which he had sold to appellee, had been burned by the Confederates,* and that he would now follow the cotton to Natchez, and cause the same to be siezed. Said cotton was shipped from Rodney to Natchez, by Clemens, and stored in the government yard. Witness saw Killingsworth a few days after in Natchez, who informed him he had the cotton seized; and witness understood from him that he had made a contract with Drake, but not what contract. Appellee employed witness to watch the cotton, which he did. It was shipped, some of it, to Cincinnati, and some to New Orleans, by Drake and Crawford, who claimed it. It was mixed with other cotton. That sent to Cincinnati was shipped by Drake, Crawford, Clemens, and treasury agent Hart.

Witness was present in a conversation between Killingsworth and appellee, in which Blair was present; something about cotton to be weighed, but did not give much attention, being occupied with something else. The cotton was marked "B" by appellee, at Rodney, and some bales were marked "Scott" already.

L. Spencer testified that—He was sutler of the Marine Brigade, and speculator in cotton. That in December, 1863, he accompanied a party of fifty men of the brigade, under Captain DeCosta and Lieutenant Ellet, into the country. Appellee was with the party. They went to the plantation of McDonald, where appellee, in the immediate presence of DeCosta and Ellet, presented a bill of sale to McDonald for some ninety-six bales of cotton, and demanded its delivery to him. That McDonald refused to deliver it, and privately directed a negro to secrete his mules and oxen, to prevent the cotton being taken; but that two wagon loads were taken. The soldiers were not near enough to hear the conversation.

E. Menure testified that—From December, 1863, to June, 1864, he was traveling from New Orleans to Natchez, and other places, speculating in cotton. In February or March, 1864, he met Killingsworth in Natchez, who told him that appellee had taken, witness believes, thirty-eight bales of cotton from Mrs. Scott's, which was in the government yard, and he had had the same seized; and that Drake had claimed the same cotton, and Drake and Clemens had got it released, and shipped it to New Orleans and Cincinnati. Proves the letter of June 11, 1864, to be in Drake's handwriting.

The letter of S. H. Drake to Gen. Ellet, of the Marine Brigade, dated June 11, 1864, states that the fleet took out from the plantation of A. W. Killingsworth, fifty bales of cotton, and also thirty-four bales from Anapias Killingsworth's, making eighty-four bales, marked "B," which Drake had bought and paid for in March, 1863, and which had been shipped by Clemens, from Rodney to Natchez. That, on examination of the title, Clemens had given him (Drake) an order for it. That he sold it, and it was then shipped to New Orleans, where it had been

Scott *v*. Billgerry.

seized by J. Billgerry as his cotton. That Billgerry had been perpetrating a gross fraud on the fleet, and robbing the people of their cotton after his had been burned. That Billgerry had told him (Drake), in January, that his cotton had been burned, and that he would take Drake's cotton in place, or anybody else's. And requests the General not to allow his officers to give depositions in favor of Billgerry that would defraud him (Drake) out of his cotton.

This letter is produced, and given in evidence by appellee.

John Schmidt testified that—He was with the party at McDonald's, on the 16th of December, 1863, when appellee demanded the cotton, and that McDonald delivered sixteen bales to appellee. He was there again the latter part of February, 1864, when Lieut. Ellet presented the same receipt as the first time, and told McDonald he should deliver appellee his cotton. McDonald said it was burned. The next day McDonald came on board the steamer Autocrat, and had a conversation with Gen. Ellet. The latter presented the same receipt, and asked McDonald if he had ever weighed, marked, mingled, set apart, or separated that cotton from his own. McDonald answered in the negative, but promised to deliver appellee's cotton, and to haul it in a day or two.

Witness accompanied the detatchment of the Marine Brigade, again under the command of DeCosta and Ellet, and with the appellee in company, to various other plantations in the neighborhood, where the bills of sale, or receipts, were presented to the parties, sometimes by DeCosta, sometimes by Ellet, and sometimes by appellee; and testifies, that in every case the same demand was made, and the same formula concerning the weighing, marking, and setting apart, and separating was gone over by whoever acted as the spokesman on the particular occasion, and that the same negative answer was always received. He states that DeCosta conducted the conversation at Mrs. Scott's; that she admitted the receipt shown, for seventy-five bales, sold by her agent Killingsworth, but stated the burning of the same by the Confederates. That she had about two hundred and fifty bales more; and that thirty-eight or thirty-nine bales

were delivered.  Next day witness *heard* that the agent of Mrs. Scott called on appellee at Rodney, and said it must be weighed, and appellee replied there was no scale there.  Knows the cotton was shipped to Natchez, and that the same thirty-nine bales were seized by the agent of Mrs. Scott, and were delivered to said agent, and by him shipped to New Orleans, to his personal knowledge.

On cross-examination, he says that—When the agent of Mrs. Scott came to Rodney to demand that the thirty-nine bales should be weighed, he asked appellee to shew him the receipt, to which the appellee replied that he had not the receipt in his possession; that Gen. Ellet had it.  This cotton was shipped to Natchez by Sherrod Clemens.  He states that the Marine Brigade was stationed in the Mississippi River, from Vicksburg to Natchez, in December, 1863, and during January, February and March, 1864, and was "*scouting*" during that time in Jefferson and Claiborne counties, for the purpose of "*bringing out*" stock, corn and cotton, and protecting citizens to bring in cotton. That witness and appellee both went along, and went to all the plantations mentioned in his testimony.

George Whitecoff's testimony is about the same as that of Schmidt, except that he states the conversation with Mrs. Scott as having been carried on jointly by appellee and DeCosta, and that he says that Mrs. Scott promised that she would deliver to appellee the amount of cotton claimed by him, and accordingly did send him some thirty-eight or forty bales, which he acknowledged to have received, stating at the same time that she owed the balance, and should deliver it to him as soon as possible.  Witness was a Lieutenant in the Marine Brigade during all the period spoken of, and was an officer of the "scouting" party, which consisted of about fifty men, under the command of Capt. De-Costa and Lieut. Ellet.

Henry Levy testified that—In the summer of 1863, he went with Billgerry from Conrad's to A. W. Killingsworth's to buy cotton. Billgerry bought seventy-five bales of him, the property of Mrs. Scott, of whom Mr. Killingsworth was the brother, and agent. Billgerry paid for the cotton, and Killingsworth gave him a receipt, which witness wrote, stating in the receipt that he would

deliver the cotton at Rodney, whenever shipments could be made. It was written in September, 1863, at Killingsworth's house, six miles from Mrs. Scott's, where the cotton was. Witness never·saw the seventy-five bales bought, and did not know how marked, or whether it was weighed or separated from other cotton. In the fall of 1863, witness was at Conrad's with appellee, when Killingsworth came and reported they were burning cotton in the neighborhood. He remarked that French flags would be respected, and appellee by that means could save his own and Killingsworth's cotton. Appellee made French flags for all the parties, and he and I carried most of them to the parties; but Mrs. Scott, who happened to be at Conrad's, took hers. Witness understood the flags were raised for the benefit of defendant as well as appellee. He states that he was not interested in any of the transactions, and has no interest in this suit.

The above was all the testimony in chief on the part of the petitioner. The defendant read in evidence the following proof, to wit:

E. Jeffords testified that—He was employed as attorney by Killingsworth, as agent of Mrs. Scott, in February or March, 1864, to file her claim before R. S. Hart, treasury agent at Natchez. He drew up a written statement; does not recollect the number of bales; but it was cotton seized by the Marine Brigade, and brought to Natchez on the Clara Bell, as the property of appellee. The cotton thus claimed by Mrs. Scott was detained a considerable time, and was finally turned over by Hart to the appellee, on an order of Gen. McArthur, commanding at Vicksburg. He saw this order in Hart's possession, and also the order signed by Hart directing the cotton to be delivered to appellee. The cotton was shipped to New Orleans. Knows that appellee claimed the same cotton, and saw his written claim on file in the office of the treasury agent at Natchez.

Lewis H. Drake testified that—He saw the cotton at Natchez, and that the same was delivered to appellee, by Hart, on the order of the commanding officer at Vicksburg, on the sworn deposition of appellee, that it was a part of two hundred and fifty

bales *for which he paid the commander of the Marine Brigade,* or *his agent,* $2,000 *in cash and sixty bales of cotton for taking it from Jefferson county to Natchez.* Witness saw the cotton afterwards on the bank of the river at Natchez, in possession of appellee, going on board the boat for New Orleans. He saw the claim and deposition of appellee in the hands of Hart, at Natchez, and read it.

Anon W. Killingsworth testified that—In August or September, 1863, as agent of Mrs. Scott, he sold and delivered to appellee seventy-five bales of cotton, under a shed containing ninety-one bales. Appellee said he would put the French flag over it, which would protect it. Appellee sampled it, and paid for it at thirteen cents per pound, in Confederate money. On the back of the bill of sale was endorsed a memorandum, signed by appellee, that if the cotton was burned by the military authorities on either side it should be appellee's loss. The cotton was not marked. Saw French flag over it.

He states that in November or December, appellee came out with the Marine Brigade, and was at witness' house. Shortly afterwards the seventy-five bales of appellee's cotton were rolled out of the shed and burned, by order of Gen. Adams. In the spring of 1864, appellee again came out with the Marine Brigade, and took the sixteen bales left under the shed, and twenty-three bales of other cotton of Mrs. Scott.

On cross-examination, he says—Fifty bales were bought at witness' house, eight miles from Mrs. Scott's. The shed was one hundred and fifty yards from her residence. The cotton was not marked; it was to be delivered at Rodney, and weighed there, after the war, or after the ports were open. The flag was put on the shed to protect appellee's cotton.

W. G. Vanse testified that—Levy told him he had some interest in some of the purchases made by appellee in 1863, in which he had been assisting.

Anapias Killingsworth proved the taking of the thirty-nine bales from Mrs. Scott, by the Marine Brigade, and that appellee was with them; also thirty-four bales from witness, which belonged to Griffing. Appellee told witness that he had put

his flag over his cotton at Mrs. Scott's, and gave witness one to put over the cotton he had at witness' house, and had given it to others in the neighborhood.

Thomas J. Cogan proved the burning of the cotton at Mrs. Scott's, by the Confederates. Wrote the certificate which was signed by Lieut. Tucker.

A. W. Killingsworth was examined in open court at the hearing, and testified that he went to Natchez in March, 1864, to follow the thirty-nine bales of cotton taken by appellee from Mrs. Scott's, and got a lawyer name Jeffords there to have it seized. The Federal lines were then closed, and he was shut out, and never knew what became of the cotton; but Mr. Jeffords and Drake sent him word that it was delivered up to Billgerry.

Before the sale of Mrs. Scott's cotton, witness had sold fifty bales of his own to Griffing & Lewis, for Drake, and afterwards sold fifty bales to appellee. The latter were burned by order of Gen. Adams, and when appellee came out with the Marine Brigade, in February, 1864, he took the fifty bales witness had sold to Griffing & Lewis, for Drake, carried it to Rodney and shipped it to Natchez, and it was about that cotton only that he had any conversation with Drake in Natchez, if he had any; and never had any about Mrs. Scott's cotton, and never had any contract with Drake respecting it. Does not know Blair, or Kraemer. Never saw either of them so far as he knows. Denies all the conversations testified to by them at Rodney and Natchez.

Levy wrote the contract for the sale of Mrs. Scott's cotton to appellee. It stated the amount of cotton, and the price paid. It was to remain at Mrs. Scott's at appellee's risk, and to be hauled to Rodney when shipments could be made. Two or three days afterwards, witness went to Conrad's where appellee was staying, and told him he did not think the bill of sale was drawn exactly according to the contract, and witness wanted him to insert that if the cotton should be burned it would be his loss. He told witness to write on the back what witness thought would be according to the contract, and he would agree to it. Witness wrote on the back of it, " If the within cotton should

be burned by military authority of either party, it would be my loss," (that is appellee's loss,) and appellee signed it, and kept the bill of sale.

Witness first sent word to appellee to come to Mrs. Scott's, and buy twenty-five bales of cotton ; he came, and witness met him on the gallery, and showed him the cotton shed, one hundred and fifty yards off. He went and examined the cotton, and sampled it; returned to the house, and they agreed on the price. He told witness to call at Conrad's for the money, which witness did, and received pay, and made a bill of sale for twenty-five bales. Some weeks after witness sent him word to come to his house. He came with Levy. Witness then sold him fifty bales of his own cotton, and fifty bales more of Mrs. Scott's cotton under the same shed with the first twenty-five bales. The bill of sale of the twenty-five bales was then taken up, and a new one made for the whole seventy-five bales. Confederate money was then worth three, four, or five for one in greenbacks, and ten or fifteen for one in gold. The bales were to weigh four hundred pounds each, to be delivered and weighed in Rodney. If the weight exceeded the average, appellee was to pay for it, and if it did not reach the amount, Mrs. Scott was to make it up in cotton. All the cotton sold to appellee was to come out of that shed.

Gen. Adams testified to the military orders issued by him for the burning of appellee's cotton, and the grounds of such order : That appellee had guided the Federal forces in a raid into the interior, and was removing cotton to the Federal lines, having previously fled the Confederate lines under grave charges.

W. S. Buck—Was a soldier in Gen. Adams' command, and was of the party, under Lieut. Tucker, detailed to burn the cotton, and proves that the cotton at Mrs. Scott's was burned.

Joseph Billgerry then testified in his own behalf, in rebuttal, that—He did not know where the cotton he bought of Mrs. Scott was stored. He bought seventy-five bales, with the privilege to pick it from any cotton on the place. The bill of sale was made at Killingsworth's, eight miles from Mrs. Scott's. He did not purchase any specified cotton. Nothing was said as to where it was to come from. Two weeks after the contract was

made, an endorsement was made on it, and signed by him, that if all the cotton on Mrs. Scott's place got burned, he was to have no claim.

After the seizure of the thirty-nine bales of cotton in Natchez on Mrs. Scott's claim, witness never obtained possession or control of it, and does not know what became of it, and never received a cent of the proceeds. In February, 1864, at Rodney, Killingsworth demanded that this cotton should be weighed, and witness told him there were no scales there, but witness would have it weighed at Natchez or Vicksburg, and give credit for every pound. Cotton was worth in Rodney on the 24th of July, 1864, from twenty-seven to thirty-five cents a pound.

On cross-examination he says—There was first a contract for twenty-five bales, and about two weeks afterwards another for seventy-five bales, and the first was torn up. The first was made at Conrad's house. He went to Mrs. Scott's to see Killingsworth. Levy went with him. Did not stay ten minutes. Saw cotton in several sheds, in seed, in lint and bales. Never heard of any shed in which there were ninety-one bales. Did not sample any cotton. Denies that he paid the brigade anything for bringing out his cotton.

The decree requires the defendant to deliver at Rodney in thirty days, thirty-six bales of cotton (charging appellee with thirty-nine bales already taken), or to pay $4,464, the value of said thirty-six bales at thirty-one cents per pound.

The court in which these proceedings took place is one unknown to the Constitution of the United States, or of this State. It was created by the provisional governor of the State, by a commission, bearing date the 12th day of July, A.D. 1865, the material parts of which are in the following words, to wit:

"I, W. L. Sharkey, provisional governor of the State of Mississippi, do hereby appoint the said George T. Swann to the office of special judge, with equity jurisdiction in all contracts for cotton or other personal property in this State, with power to proceed in a summary way on petition, to enforce specific performance, or rescind contracts, on notice to parties."

The commission further empowers the judge to issue process,

to punish for contempt, and to appoint a clerk; and makes it the duty of sheriffs to execute the process, and enforce decrees.

On the 25th day of July, 1865, the day after this suit was instituted, the governor issued an amendment or supplement to the original commission, as follows: "Whereas doubts have arisen in the minds of some persons in regard to the extent of the jurisdiction intended to be conferred upon George T. Swann as special judge, it is hereby declared, that, in decreeing specific performance of contracts in reference to cotton, or other property, he has power to make his decrees in the alternative, for the cotton or other property, or for its value if the property itself cannot be had, or has been sold or disposed of; the measure of value to be regulated by the value of the thing at the time suit was brought, with ten per cent. damages."

It is objected, in the first place, that the provisional governor had no power to create such a tribunal, and that all its proceedings are *coram non judice*, and void.

In determining this question, the actual circumstances of the country are to be borne in mind. At the close of a protracted war between the United States and the Confederate States, the military power of the latter being subdued, and their government subverted, the State of Mississippi fell under the power of the Federal arms. That power was exerted to its full extent. The civil government was totally overthrown, and all its functionaries were ejected from their offices. The legislature was forbidden to assemble; the governor was arrested and carried to prison; the courts were all closed; the archives and public records of the State were seized; the administration of the laws was suspended; and the military power reigned supreme. All the rights of government usually exercised by a military conqueror over a foreign territory, subdued by arms, were asserted and put in operation, and only such laws and regulations were enforced as the military commanders saw proper to permit, and that only by functionaries of their own appointment. In the proclamation of the President, dated June 13, 1865, he declared that "the rebellion had, in its revolutionary progress, deprived the people of the State of all civil government;" and this was

true; for the military power of the United States had torn it down, and had established itself upon the ruins. This proclamation goes on to appoint W. L. Sharkey to be provisional governor of the State, and to define some of his powers and duties. The government thus created was essentially a military government, and the provisional governor derived his powers directly from the President, as commander-in-chief of the army and navy of the United States. The power of the President to create such governments in conquered territory (which was the light in which the subject must have been viewed by him), and to appoint judicial tribunals, with more or less jurisdiction, to enforce the laws, seems to be well-settled upon general principles. It has been decided, in reference to the temporary conquest and occupation of a portion of the territory of the United States by a foreign enemy, that by such conquest and occupation, the territory passed under the allegiance and sovereignty of the enemy, and that the laws of the United States were necessarily suspended, and that by their surrender the inhabitants became subject to such laws, and to such laws only, as the conquerors chose to impose. No other laws could in the nature of things be obligatory upon them; for where there is no protection or sovereignty, there can be no claim to obedience. (*United States* v. *Hayward*, 2 Gallison, 485, 501; *United States* v. *Rice*, 4 Wheaton, 246.)

Upon the conquest of New Mexico by the United States forces, under Gen. Kearney, he established therein a new government, and ordained an entire code of laws, which were held to prevail until altered by Congress, or by the territorial government subsequently erected. (*Leitensdorfer* v. *Webb*, 20 How. U. S., 176.) Judge Daniel, delivering the opinion of the court in that case, says: "Upon the acquisition in the year 1846, by the arms of the United States, of the Territory of New Mexico, the civil government of this territory being overthrown, the officer (Gen. Kearney) holding possession for the United States, by virtue of the power of conquest and occupancy, and in obedience to the duty of maintaining the security of the inhabitants in their persons and property, ordained, under the sanc-

tion and authority of the United States, a provisional or temporary government for the acquired country. By this substitution of a new supremacy, although the former political relations of the inhabitants were dissolved, their private relations, their rights vested under the government of their former allegiance, or those arising from contract or usage, remained in full force and unchanged, except so far as they were, in their nature and character, found to be in conflict with the constitution and laws of the United States, or with any regulations which the conquering and occupying authority should ordain. Amongst the consequences which would be necessarily incident to the change of sovereignty, would be the appointment and control of the agents by whom, and the modes in which the government of the occupant should be administered—this result being indispensable in order to secure those objects for which such a government is usually established." See also *United States* v. *Perchman*, 7 Peters, 51 (86), and *Mitchell* v. *United States*, 9 Peters, 711.

The aspect of the case, in any sound view of the constitutional relations between the States and the Federal government, would be different. Assuming the doctrines of those who supported the cause of the Union, none of these belligerent rights existed after the close of actual hostilities. It was maintained by them that a State had no right to separate from the Union, and that the people of the Confederate States were rebels in arms against their rightful sovereign. The war waged against the people of these States could be justified on no other theory—for if the right to withdraw existed, the war was a flagrant wrong—and the logical deduction from the premises was, that the relations of the States to the Union suffered only a temporary derangement, and that upon the suppression of armed resistance to the National authorities, the States immediately and necessarily resumed their normal position as States in the Union, and fell at once into their regular movements in their former orbits. Such a result, however inevitable it may have seemed, was not allowed to be realized, and we have been subjected to the ordinary rules of warfare and conquest, as they exist between distinct and independent nations. However inconsequential this

may be, and however inconsistent with the principles and purposes avowed in the prosecution of the war, to wit, the indissolubility of the Federal Union, and the compulsory restoration of the seceding States, nevertheless the facts exist in a form that defies logic, and we have no choice but to accept the condition actually impressed upon us by superior power, and to govern ourselves by the rules and principles applicable to such cases. The legitimacy of the existing State government depends in a great measure upon the power of the President to establish the provisional government, and it is our duty, unless compelled by a strong necessity, not to assert any theories having a tendency to disorganize the State, or overthrow existing institutions. Indeed, whatever may have been the original character of this contest, and whoever may have been in fault—questions which it is not the province of this court to discuss—by the rules of the voluntary law of nations, every regular war is on both sides accounted just, as to its effects; and its results have to be accepted as lawful. *Vattel*, 382, 385.

We cannot measure the authority of the provisional governor by the terms of the proclamation appointing him, nor restrict his powers to the particular subjects specified in it. The proclamation is not necessarily his only authority. Whatever power in this respect was possessed by the President, might be delegated by him to the governor, and in the absence of any evidence that any particular act of the governor was disapproved by the President, we must suppose that it was authorized beforehand, or subsequently ratified and adopted. The power in such cases to create judicial tribunals, and to appoint judges to administer the laws in the form and to the extent permitted by the conqueror, was exercised in the case of New Mexico, and approved by the Supreme Court in the case heretofore quoted; and when exerted in conformity to the controlling provisions of the Constitution of the United States, seems to be free from valid objection.

This tribunal, as created by the provisional governor, was not a State, but a Federal court, deriving its existence, and all its powers, from the Federal Government. The governor was

a Federal officer, appointed to administer the Federal rule over·
the State; and the war-making power of that government was
the source of all his authority.   But when the State Conven-
tion, convoked by the governor under the direction of the
President, assembled, that body, finding this court in operation,
and others of like character in other places, passed an ordinance,
dated August 23, 1865, whereby it was declared, " that the
special courts of equity heretofore, and that may be hereafter,
established in this State by the provisional governor thereof,
be and the same are hereby recognized to be in existence;"
and this ordinance provided for the revision by this court, on
appeal or writ of error, of all judgments of such special courts ;
and that, after the courts known to the constitution and laws
of this State are established, such special courts shall not be
recognized beyond the then unfinished and instituted business
of the same.

This ordinance was not necessary to impart any additional
validity to the courts.   The time appointed by the convention
for the State government to go into operation, and for the
establishment of the courts known to the constitution and laws,
was the third Monday (16th day) of October, 1865, and until
that time, the provisional government, and the courts estab-
lished by its authority, would of course continue, independently
of the will of the Convention.   The effect of the ordinance
was merely to recognize these courts as having a lawful existence,
and to adopt them as State tribunals, so far as to bring them
into relation with the supreme appellate courts of the State,
and to subject their judgments to the revision of this tribunal,
" as in the case of appeals and writs of error from the circuit
and chancery court of this State."   But if any doubt could
remain, as to the legal existence of the courts under the creation
of the provisional governor, this ordinance would be sufficient
to put that matter at rest, and to give them that legal existence,
to the extent of the powers actually conferred upon them,
subject to the particular restrictions and general principles of
the constitution.

It may next be inquired, what was the extent of the jurisdic-

tion of the courts thus created and established under the commission issued to the judges, and the explanatory order in relation thereto.

The civil government of the State having been subverted, and all power having passed into the hands of the authorities of the United States, the question whether any, and what, civil government should be permitted, was a matter in the discretion of those authorities. During this military occupation, the laws of the State could only operate so far as they chose to allow, and could only be administered by such agents as they pleased to appoint. The President could create courts of justice, or not, at his discretion. He could cause all the laws of the State to be administered and executed, or he could cause the whole to be disregarded and set at naught. We are therefore to look at the action of the provisional governor, representing the President in this respect, to ascertain what he has authorized to be done, and from that, by a necessary implication, what he has forbidden to be done. Having the whole subject before him, with full power over it, it is to be presumed that he has expressed whatever he intended to ordain, and that what he has not expressed, he intended to prohibit. His acts are to receive a fair and reasonable interpretation, and are to be construed by the same rules that apply to ordinary measures of legislation.

The first public act of the provisional governor, after his appointment, was the issuance of his proclamation of July 1, 1865, by which he appointed in every county the judges and clerks of probate courts, boards of police, justices of the peace, and all other county officers; and authorized them to enter upon the full discharge of their duties, on taking the oath prescribed by him. The exclusion of any provision for the circuit and chancery courts shows clearly that it was not intended that the jurisdiction of these tribunals should be exercised in the then condition of affairs. It would have been easy then to have reopened all the civil courts, and to have fully restored the ordinary administration of justice. The omission to do so was no doubt the result of design, and not of accident.

Two days after the date of the above proclamation, the governor, by an order dated July 3, 1865, " ordered, that the act in regard to the action of replevin, and the amendments thereto passed by the legislature of Mississippi, since the 9th day of January, 1861, be and the same is hereby declared to be in full force from this date." The act here referred to, is an act entitled " An act to provide for the speedy recovery of personal property wrongfully taken or detained," approved December 3, 1863, chapter 19, by which, in all cases of the wrongful taking or detention of personal property, a summary remedy by action of replevin before two justices of the peace, was given to the party injured, to recover the property and damages for the wrongful taking or detention. This was the only court created by the governor for the adjudication of legal rights; and these are the only cases committed to its jurisdiction; leaving all the rest of the immense mass of legal rights wholly without any redress.

The establishment of the Special Court of Equity on the 12th of July, completed the system of jurisprudence which the provisional governor thought proper to put in operation during his administration; and the extent of the jurisdiction of the latter court is the immediate question under consideration. It is a court " with equity jurisdiction," but not a court of general equity jurisdiction. Its powers are specifically confined to a single class of cases, to wit, " contracts for cotton or other personal property in this State;" leaving all the other numerous heads of equity jurisdiction entirely beyond its cognizance. It is not even a court of general equity jurisdiction in contracts for cotton or other personal property; but only has power to " enforce specific performance, or rescind" such contracts. The jurisdiction conferred upon the court, is defined in the most appropriate technical language, the meaning of which is well settled in the law. And we think the plain and evident intention was, to create a court of equity, with the ordinary powers of such a court, to exercise the jurisdiction properly belonging to a court of equity, over the particular subjects entrusted to its cognizance, to wit, the specific performance and rescision of contracts for cotton or other personal

Scott *v.* Billgerry.

property in this State, and to be regulated and controlled in the discharge of its functions, by the rules that prevail in courts of equity, as recognized in the jurisprudence of this country. Whatever powers legitimately belong to courts of equity generally, and none others, belong to, and may be rightfully exercised by, the special judge appointed by this commission, over the subjects to which his powers extend.

We come, then, to the inquiry whether the case made by this record is one in which, according to the settled rules of a court of equity, the appellee is entitled to relief.

The petition is very concise. It alleges that the defendant sold the petitioner seventy-five bales of cotton averaging four hundred pounds per bale, for the sum of $3,900, then paid, which cotton was to be delivered, when required, in good order at Rodney, and that defendant refuses to deliver the said cotton, and it therefore prays that a specific performance may be decreed. There is thus stated a sale of cotton, the payment of the price, and a refusal to deliver. It may confidently be affirmed, that no case can be found in the books in which the specific performance of such a contract, on such a state of facts, was ever decreed in a court of equity.

The general principles that regulate the discretion of a court of equity, when the specific performance of a contract is claimed, are plain and simple. Ordinarily, in the case of chattels, the court will not interfere to decree a specific delivery, because by a suit at law a full compensation may be obtained in damages, although the thing itself cannot be specifically obtained; and where such a remedy at law is perfectly adequate and effectual to redress the injury, there is no reason why courts of equity should afford any aid to the party. The rule is illustrated by stating the exceptions to it; and these always depend upon peculiar circumstances, as where the thing is of peculiar value and importance, and the loss of it cannot be compensated in damages; or where some other ingredient of equity jurisdiction is mixed up in the transaction. Various cases are put in the books, in which this jurisdiction has been exercised, from the cases of the Pusey horn, and the Duke of Somerset's altar-piece, down to

that of the mad-stone, with the romantic legend recorded by Judge Clayton in *Murphy* v. *Clark;* but all of them turned upon some *pretium affectionis,* ·or other peculiar circumstances, to take them out of the admitted general rule. In regard to contracts respecting personal estate, it is generally true that no particular or peculiar value is attached to any one thing over another of the same kind; and that a compensation in damages meets the full merits, as well as the full objects, of the contracts. If a man contracts for the purchase of a hundred bales of cotton, or boxes of sugar, or bags of coffee, of a particular description or quality, if the contract is not specifically performed, he may generally, with a sum equal to the market price, purchase other goods of a like description and quality; and thus completely obtain his object, and indemnify himself against loss. 2 Story's Eq., sections 718, 709, 700, and 746; 3 Parsons on Con. 364; Willard's Eq. Ju. 368, 271; 1 Leading Cases in Equity, 520 to 534; Notes to the cases of *Cudder* v. *Rutter, Pusey* v. *Pusey,* and *Duke of Somerset* v. *Cookson.*

It is altogether immaterial whether there was a sale of certain specific bales of cotton, or an agreement to sell and deliver a certain number of bales out of a particular lot, or a general agreement to sell and deliver a certain number of bales, without any designation of the specific bales, or of the particular lot out of which they are to come. All such cases depend upon the same general principle. The rule is, not to entertain jurisdiction in equity for a specific performance of agreements respecting goods, chattels, stock, choses in action, and other things of a personal nature, unless, under the particular circumstances of the ʹcase, there can be no adequate compensation in damages at law. 2 Story Eq. Ju., sections 717, 717*a,* and 718. Difficulty sometimes occurs, in the application of the rule, whether the circumstances of a particular case will exempt it from its operation; and equity writers and judges are often disposed to enlarge their jurisdiction beyond its proper limits. But there can be no difficulty in a case like the present, if the general principle be admitted. In this State it seems to be fully established. The right to go into chancery to obtain the specific delivery of slaves, was expressly

put upon the *pretium affectionis*, and the peculiar nature and character of the property, and since that right was established, this court has clearly recognized the rule that a court of equity cannot take jurisdiction in cases of personal property, where there is an adequate remedy at law. *Hoy* v. *Hansborough*, Freeman Ch. R. 543 ; *Murphy* v. *Clark*, 1 S. and M. 235 ; *Butler* v. *Hicks*, 11 S. and M. 86 ; *Echols* v. *Hammond*, 30 Miss. 177 ; *Brown* v. *Bank of Miss.* 31 Miss. 454 ; *Brown* v. *Gooldsby*, 34 Miss. 437.

But it is argued that if the appellee is not entitled to a decree for specific performance, he is entitled to a decree for the value of the property ; and this is claimed, first, under the general principles of equity jurisprudence, and secondly, independently of such principles, by force of the amended or explanatory order of the provisional governor.

We do not think this pretension can be supported upon either ground. Courts of equity do not entertain jurisdiction to give redress by way of compensation or damages, for breaches of contract or other wrongs, where these are the sole objects of the bill. Such relief is only decreed where it is incidental to other relief sought by the bill, and granted by the court ; or where there is no adequate remedy at law ; or where some peculiar equity intervenes. Wherever compensation or damages are incidental to other relief, as for instance, where a specific performance is decreed upon the application of either party, with an allowance to be made for any deficiency as to the quantity, quality, or description of the property, or for any delay in performing the contract, there it seems clear that the jurisdiction properly attaches in equity ; for it flows, and is inseparable from the proper relief. But where a specific performance is denied, such compensation or damages do not seem to be allowed, except in cases where the defendant, after suit brought, has put it out of his power to perform, and the specific performance is denied on that account. After a review of the subject, Judge Story sums up by saying : " In the present state of the authorities, involving, as they certainly do, some conflict of opinion, it is not possible to affirm more, than that the jurisdiction

for compensation or damages does not ordinarily attach in equity, except as auxiliary to a specific performance, or some other relief. If it does attach in any other cases, it must be under very special circumstances, and upon peculiar equities, as for instance in cases of fraud; or in cases where the party has disabled himself, by matters *ex post facto,* from a specific performance; or in cases where there is no adequate remedy at law." 2 Story's Eq. Ju., chapter 19, sections 794 to 799. Willard's Eq. Ju. 309.

Nor do we think the claim stands on a better footing under the amended or explanatory order. Its language is, " In decreeing specific performance, he (the judge) has power to make his decrees in the alternative, for the cotton or other property, or its value." It was evidently intended merely to expand the jurisdiction proper to a court of equity, of decreeing compensation or damages as auxiliary and incidental to a decree of specific performance, and applies only to cases in which it is proper to decree such specific performance. Compensation can only be allowed, under this order, as an alternative relief, and must be supported by an ordinary decree of specific performance; and, in cases like the one under consideration, where it is improper to decree a specific performance, there can, of course, be no alternative decree for compensation or damages.

Any other interpretation of this explanatory order would give it an effect far beyond its legitimate scope and object, and beyond the constitutional power of the provisional governor, or of the President. If not restricted in its application as above stated, then its effect must be to declare, that, in all cases of contracts for cotton or other personal property, where a specific performance cannot be decreed according to the general principles of a court of equity, the judge of the special court shall have power to entertain bills for the recovery of compensation or damages for the breach of such contracts, and that the measure of damages shall be the value of the property on the day the suit shall be commenced, with ten per cent. added thereto.

This would be to make a very different rule from the one actually prescribed by the governor, and would do violence not

only to his plain intention, but also to clear constitutional principles.

Without disputing the power of the Executive of the nation, while holding a State under absolute military rule, to create provisional governments, to ordain laws, and to establish judicial tribunals for their administration, still, all these powers must be exercised in subordination to the Constitution of the United States. That instrument recognizes the distinction between legal and equitable rights, and when the President, or his subordinates, undertake to create civil tribunals to administer the laws of any State or Territory, held for the time being under military dominion, he is bound to respect these fundamental regulations, and to refrain from exercising a power which the legislative department of the government would not, in the same case, possess. He may abstain from instituting civil tribunals, if he will; but if he exercises the power, he cannot disregard the restrictions of the organic law. The seventh amendment of the constitution provides that, "In cases at common law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved." The phrase "*common law*" is here used in contradistinction to *equity*, and admiralty and maritime jurisprudence. The trial by jury is required in all suits in which *legal rights* are to be ascertained and determined, in contradistinction to those where *equitable rights alone* are recognized, and equitable remedies administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity, are often found in the same suit. This clause of the constitution embraces all suits which are not of equity or admiralty jurisdiction, whatever may be the peculiar form they assume to settle legal rights. *Parsons* v. *Bedford*, 3 Peters, 433, 466, 467.

And the adoption of the State practice by the courts of the United States, in States where no distinction exists between cases at law and equity, does not confound these principles, nor authorize legal and equitable claims to be blended together in one suit. The constitution establishes the distinction between law and equity; and a party who claims a legal title must pro-

ceed at law, and may proceed according to the forms of practice in such cases in the State courts. But if the claim is an equitable one, he must proceed according to the rules which the Supreme Court of the United States has prescribed, regulating proceedings in equity in the courts of the United States.   *Bennett* v. *Butterworth,* 11 Howard U. S. 669, 674.

A suit to recover damages or compensation, for the breach of a contract for the sale and delivery of personal property, is a purely legal demand, and is properly the subject of a "suit at common law;" and the party cannot be deprived of his right of trial by jury, by a legislative or executive declaration that the subject-matter shall be cognizable in a court of equity. What belonged to the jurisdiction of courts of equity, at the adoption of the constitution, belongs to them still; and whatever was then cognizable in the courts of common law, remains a "suit at common law," in which the parties are entitled to a jury trial—a right justly dear to the American people, and which it is the duty of the court to preserve, protect and defend. If, therefore, the executive had undertaken, which we think he did not mean to do, to extend the equity jurisdiction of the special judge, so as to embrace the adjudication of any legal right, such action would have been void, for the want of a provision for a trial by jury.

It was as easy to have created a court of law, with power to adjudicate legal rights, as to establish this court of equity.   The power was the same.   Indeed the whole jurisdiction might have been bestowed upon the same tribunal.   The omission to do so is itself very significant; and no argument can be raised from it in favor of extending by construction the powers of the equity judge.   Giving these powers the largest latitude contended for, and they would then embrace only a limited class of persons, and but a very small portion of the subjects of legal and equitable jurisprudence, leaving creditors, generally, wholly without any remedy.

The ordinance of the State convention, as has been shown, merely recognizes the existence of the special courts, for the purpose of subjecting them to the controlling supervision of

this court. It does not undertake to create them, nor to define their powers, nor to ratify the action of the governor in establishing them. It assumes that they already existed by lawful authority, with whatever jurisdiction they were empowered rightfully to exercise. What that jurisdiction was we have attempted to explain, and we have shown that it was not intended to give them any power to adjudicate legal rights, but only such cases of equity cognizance as were enumerated in the acts by which they were instituted. The convention did not deal with their jurisdiction, to enlarge, restrain, or confirm it.

If the right to take cognizance of cases like the present, depends at all upon this ordinance, we do not think the jurisdiction can derive any support from it. In addition to the views presented as to the intention apparent upon the face of the acts creating the courts, and of the ordinance recognizing them, which appear to us to be conclusive of the question, there is another argument of much force against giving the ordinance the construction contended for. If it is to have the effect of conferring upon the court the powers claimed for it, then the convention must be understood to have intended the creation of a state court, for the settlement of legal rights, in which the trial by jury should not be admitted.

When we consider that the same convention, at the same moment, put forth a constitution for the state, containing, in its first chapter, a " Declaration of Rights," in which is embodied the provisions, common to the constitutions of all the States, as well as that of the Union, that " the right of trial by jury shall remain inviolate," and that this declaration of rights concludes with the emphatic assertion, that everything therein contained " is excepted out of the general powers of government, and shall forever remain inviolate, and that all laws contrary thereto shall be void," we cannot suppose that the convention intended, by a collateral ordinance, remedial in its character, and of the nature of an act of ordinary legislation, to violate the fundamental principle which they had so solemnly incorporated as a. part of the organic law. On the contrary we must infer, that the convention regarded these courts as possessing no powers

10

which, in their legitimate exercise, would deny to any citizen the enjoyment of this venerated and inestimable mode of trial.

We are therefore clearly of opinion that the case under consideration was not a proper one for relief in a court of equity, and that the petition ought to have been dismissed.

Apart from the views before expressed, we think that, upon the facts of the case, the decree of the court below was erroneous.

The evidence was conflicting in some respects, but upon a careful review of it, we are satisfied that the appellee purchased seventy-five bales of cotton, out of a lot of ninety-one bales, then under a particular shed on the appellant's plantation; and that there was endorsed upon the bill of sale an agreement, signed by appellee, that if the cotton should be burned by military authority on either side, the appellee should bear the loss. The cotton was not to be delivered until shipments could be made. After making extensive purchases of cotton in the neighborhood, on similar conditions as to delivery, the appellee went into the Federal lines, and shortly after returned with a portion of the Federal Marine Brigade, which he guided in a raid through that vicinity, visiting the plantations, and demanding the delivery of cotton from some of those who had sold to him, and actually seizing and carrying away a portion of it. These facts coming to the knowledge of General Adams, he caused all the remaining cotton which the appellee had purchased, to be burned. At the appellant's place, seventy-five bales were rolled out from under the shed, by order of the Confederate officer, and were burned as the property of appellee. Subsequently appellee came again, backed by the same military force, and seized and carried away the sixteen bales remaining under the shed, and also twenty-three other bales from another spot. It is true he testifies that this cotton was afterwards restored to appellant, and that he did not obtain the benefit of it; but the testimony clearly proves that the facts are otherwise. By his acts of open hostility, and his efforts to violate the laws and policy of the Confederate Government, he was the active cause of the destruction of the entire quantity he had bought out of

Scott *v.* Billgerry.

the lot of ninety-one bales, and he subsequently seized and appropriated the residue. Whether the separate title to any particular bales of this cotton is vested in appellee, is immaterial. By the statement of his petition, there was a complete sale of the seventy-five bales, and other circumstances go to show that such was the intention of the parties. But however that may be, the appellee having agreed to bear the loss in case the cotton was burned, and having himself caused the destruction of a part, and having carried off the remainder of the lot out of which his purchase was to be taken, and thereby put it out of the power of appellant to comply with her contract, he has no claim now to a decree against her for a specific performance.

The decree of the court below will be reversed, and the petition of the appellee dismissed, without prejudice, at his costs in both courts.

HANDY, C. J., delivered the following dissenting opinion:

I am unable to agree with the views taken in the opinion of the majority of the court in this case, in relation to the jurisdiction of the Hon. George T. Swann, special judge, over the subject-matter of the contract sought to be enforced, and as to the propriety of reversing the decree, on that ground; and I will state very briefly the reasons of my dissent from those views.

It is conceded that there was a sale of seventy-five bales of cotton, that the purchase money was paid, and that the vendor, the appellant, entered into a contract in writing to deliver the cotton at a specified place; and this bill was filed for the purpose of enforcing a specific performance of that contract. In the court below, no objection appears to have been made, either by demurrer, or in the answer, or by motion to dismiss, on the ground that it was not a case within the jurisdiction of the court; and the defence was placed wholly on the ground that, upon the facts and special grounds of defence set up in the answer, the appellee was not entitled to recover, either at law or in equity. The question of jurisdiction appears to have been raised for the first time in this court.

If the objection was, that the court had not jurisdiction of

the *subject-matter* of the specific performance of contracts for the sale and delivery of personal property, *under any state of circumstances,* it is true that that objection might be taken, and should be entertained, at any time in the progress of the cause, either in the court below, or in this court, by pleading, motion to dismiss, or assignment of error, on that ground. But that position has not been contended for in the argument here, and it is clear that it could not be maintained; for the books are full of cases in England and in this country, and especially in more recent times where specific performance has been enforced, of contracts for the performance of acts in relation to personal property, and for the transfer or delivery of chattels, and where decrees have been rendered for compensation in damages in default of performance, under special circumstances. These cases are numerous and familiar to the profession, and need not be here enumerated or commented on.

But the objection urged here, and sustained by the opinion of the majority of the court, is, that the facts of the case, as developed by the evidence, showed that it was not a proper one for the exercise of the jurisdiction of a court of equity ; that the court below exercised its jurisdiction erroneously, in the case made by the proofs. It was, then, mere error in the court below in the particular case, and not want of jurisdiction of the subject-matter.

It is a just and salutary rule, constantly acted on in this court, not to entertain assignments of error here, and reverse judgments upon points not made in the court below. Parties are required to state their cases by their pleadings in that court, whether at law or in equity. On that, and on the legitimate steps appearing, by the record, to have been taken in the court below, the case presented here must stand or fall. And this court acts upon the just and reasonable presumption, when a new point is raised here, that, if the objection had been made below, it might have been properly met, if, indeed, under any conceivable state of circumstances, it might have been obviated. Thus, if the court below had jurisdiction of the subject-matter, under any possible state of circumstances, and the case turned, under the

pleadings, upon grounds which conceded the jurisdiction, by placing the defence on points independent of it, it will be presumed that the particular facts justifying the exercise of the jurisdiction existed, and could have been proved, had it been proper or necessary to make the proof under the issues made by the pleadings. Any other rule would work surprise and great injustice to parties in this court; and this court would occupy the attitude of deciding a case not made by the parties, possibly to the irremediable prejudice of one of them, and upon grounds which were conceded or pretermitted by the opposite party in the court below, and which might have been obviated if duly presented there.

I think, therefore, that it is not proper to hold that the peculiar circumstances did not exist in this case to justify the exercise of the jurisdiction, which, upon general principles of equity jurisprudence, a court of equity may exercise in relation to contracts for personal property, either as authorizing a decree of specific performance, or compensation in damages.

It is, undoubtedly, well established as a matter of general equity jurisdiction, that courts of equity will not decree specific performance of contracts in relation to personal property, or compensation in damages for their non-performance, unless under peculiar circumstances, showing that the remedy at law is not complete and adequate. But it appears to me manifest that the edict of the provisional governor, appointing Judge Swann special judge, and defining his powers, greatly extended and enlarged the ordinary powers of a court of equity in such cases, and were clearly intended to have that effect.

In determining the extent of the authority thus conferred, we must take into consideration as well the circumstances which led to the establishment of the special court—which are matters of public notoriety as events in the history of the times—as what was done by the provisional governor in making the appointment.

When the provisional governor assumed the functions of his office, there was a total subversion of the State government, in its executive, legislative, and judicial departments, and the only

semblance of government in the State, was that of arbitrary military rule. A state of lawlessness was the consequence, not only in the acts of many of our people proceeding from the prevailing state of confusion, but in the course pursued by the military officers in *their* mode of administering law and acting on the civil rights of the people. In all cases of wrongs, the military tribunals were the only resort. When horses, mules, or cotton, which were the principal subjects of contention, were taken or interfered with, whether justly or not, application was made to the commanding general; and, without notice to the adverse party, and on *ex parte* showings, the most summary orders were made and enforced by the most stringent process known to martial law. This was particularly the case in regard to cotton. Owners of cotton, who had sold it to purchasers during the war, obtained orders and guards to prevent purchasers from taking possession of it, and owners were frequently dispossessed of it by purchasers by the same process; and, by these means, grievous wrongs were done to both parties, insomuch that it was a crying evil in the land.

After the provisional governor entered on the duties of his office, he was applied to in numerous cases, by the parties aggrieved by such orders, for relief, and in many other cases, for the purpose of settling such disputes between the parties ; and, in order to provide tribunals for adjusting such controversies, he ordained that the replevin law of the State, giving jurisdiction to justices of the peace in all actions of replevin, should be in force—which was intended to furnish a remedy for the recovery of horses, mules, and other specific chattels—and he appointed Judge Swann special judge, with special reference to contracts in relation to cotton, which had been a fruitful source of strife before the commanding general and the provisional governor.

The end intended by this appointment unquestionably was, to provide a tribunal which should settle all disputes between planters and purchasers, in relation to contracts for the sale and delivery of cotton. That was the pressing evil which called for interposition, and there was no judicial tribunal in the State to

Scott *v.* Billgerry.

settle such disturbing contentions. Under these circumstances Judge Swann was appointed by an order in these words:.

" I, William L. Sharkey, provisional governor of the State of Mississippi, do hereby appoint said George T. Swann to the office of special judge, with equity jurisdiction in all contracts for cotton or other personal property in this State, with power to proceed in a summary way on petition, to enforce specific performance or rescind contracts, on notice to parties ;" etc., to appoint a clerk with fees as allowed chancery clerks, to enforce decrees, and to receive prescribed fees in each case.

What, then, was the extent of the power conferred by the terms of this appointment ?

In the first place, he is appointed " special judge," generally, with no restriction of his powers to matters of equity cognizance.

In the second place, he is clothed " with equity jurisidiction in *all* contracts for cotton or other personal property in this State." This power is not restricted to matters cognizable in a court of equity, by the ordinary rules of equity jurisdiction, but, by its very terms, the " equity jurisdiction " is to extend to " *all* contracts for cotton or other personal property." It conferred a jurisdiction entirely new in a court of equity, and that was " jurisdiction in all contracts for cotton," etc., whatever might be their nature or character ; and, in calling it " equity " jurisdiction, it must have been intended simply, that the *modes of proceeding* were to be according to the rules prevailing in equity courts. If it was intended to limit the jurisdiction to cases where a court of equity would have had it, according to the ordinary rules of equity jurisdiction practised in such courts, it is plain that such a court would have had no jurisdiction of contracts generally for cotton, as is shown in the opinion of the majority of the court, either to decree its specific delivery, or compensation in damages. According to this view, the order in practical effect conferred nothing, and the jurisdiction, so carefully created, was nugatory. Such a power would have been vain and useless to meet the exigency which called on the provisional governor to institute the court; for the power conferred would not have

embraced one case in fifty, or perhaps a hundred, requiring judicial interposition. And we are thus led to the strange conclusion, that *an extraordinary court is instituted*, in a great public emergency, and *yet is absolutely without power to give relief in a single case for which it was created !*

The power granted by this clause of the order was a distinct and substantive one, intended to embrace " *all* contracts for cotton," and thereby to furnish a tribunal to adjust the various controversies, then rife in the country, in relation to such contracts, whether of an equitable or legal nature ; to settle the rights of the parties under such contracts, and administer plenary justice between them, according to the circumstances of each case. And nothing short of this would have met the exigencies and settled the disturbances of the country, which really called the court into existence. Without such power, a vast majority of the cases would not have been relievable in the court, and must have been left to the arbitrary rule of military officers, who seemed by no means loth to use their power in such cases. In the numerous cases that have been brought here from that court, there is scarcely one where a court of equity, on general principles and apart from the order of the provisional governor, would have jurisdiction.

In the third place, the judge is clothed " with power to proceed in a summary way on petition, to enforce specific performance, or rescind contracts." This appears to me to be a distinct and substantive branch of the power conferred ; or it, at least, was intended to specify two of the particulars only in which the general power granted in the preceding clause was intended to be exercised. But if it be considered as part of the preceding clause, and that both the clauses have reference to the power to enforce specific performance or to rescind contracts, yet it seems to me to be doing violence to the clear language to say, that that jurisdiction was not to be exercised in " *all* contracts for cotton," whether embraced within ordinary equitable rules or not ; and that construction would debar the court of the power to settle the controversy in nearly all the cases intended for its adjudication.

The court was to proceed, not in the usual slow march of chancery courts, but "in a summary way;" because the emergency arising from hot disputes about cotton contracts was pressing, and required prompt action to remedy the evils existing, and to settle the controversies. And this tends to show that the court was in nowise, intended to be restricted to the ordinary rules governing courts of equity.

A short time after the court had gone into operation, under this order, a supplementary declaration was issued by the provisional governor, stating that, whereas doubts had arisen in the minds of some persons in regard to the extent of the jurisdiction intended to be conferred on Judge Swann, it was thereby "*declared*, that in decreeing specific performance of contracts in reference to cotton or other property, he *has* power to make his decrees in the alternative, for the cotton or other property, or for its value if the property itself cannot be had, or has been sold or disposed of—the measure of value to be regulated by the value of the thing at the time suit was brought, with ten per cent. damages."

It is to be observed, that the "doubts" referred to are not mentioned as having reference to the general powers of a court of equity in relation to contracts for personal property, but to the jurisdiction intended to be conferred by the first order. This second document then proceeds to *declare* the power which he had *granted under the previous order*, not to grant new powers. It is wholly declaratory. It declares that he *has*, not shall have, power—1, to make his decrees in the alternative, for the cotton or for its value, if the property itself cannot be had, or has been sold or disposed of; 2, to fix the measure of value at the time of suit brought; 3, to allow ten per cent. damages.

Now, this document had reference to only one branch of the power conferred in the previous order, and it is perfectly clear that it recognizes rules of action by the judge under the previous order, totally unknown to the ordinary rules of equity jurisdiction in cases of specific performance: 1. In allowing a decree in the alternative, for the property or its value. This

was the rule at law applicable to the action of *detinue;* and it shows clearly that *the first order* was intended to confer powers unknown to equity proceedings, and to give the powers of a court of law.    2.  It allows a decree for specific performance, or *the value of the property,* " *if it cannot be had,* or has been sold or disposed of," without regard to the circumstances under which, or the time when, it has been disposed of.    This is in opposition to the well-settled rule in courts of equity ; but it is the rule at law.    3.  The measure of damages is fixed as to time; and that, likewise, is the rule at law, and follows the action of *detinue.*

All this is to be done by virtue of the first order, and is embraced under the general power contained in the first clause of that order.    But, at all events, it is a broad enlargement of equity power, totally inconsistent with its rules of ordinary jurisdiction; and it shows clearly, that, though the court was to proceed according to the rules of procedure of a court of chancery, yet its essential powers were, by no means, to be circumscribed by the rules of that court.    This appears to me to be abundantly clear, from the purposes intended to be accomplished by the appointment of the judge, which would otherwise utterly fail; and from a just interpretation of the orders prescribing his powers.    If these orders do not mean this, they mean nothing.    And it is worthy of remark that this appears to be the view taken of the subject by almost every member of this bar; for, though the contrary view has been somewhat contended for in this case, yet in none of the cases that have come under my observation here, except one, has the objection been made in the court below, by demurrer, answer, or otherwise— which goes far to show that the opinion of the profession is that it is not tenable.

But, it is said, that this construction would, under the order of the provisional governor, be repugnant to the seventh amendment to the Federal Constitution, which is as follows:

" In suits at common law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise reëx-

amined in any court of the United States, than according to the rules of the common law."

The argument is, that, under the construction here given, the order would transfer to courts of equity matters properly cognizable at law, and thereby deprive the defendant of the right of trial by jury, to which he was entitled under this article of the constitution. But this view seems to me to be untenable.

1. In the first place, the article has no application to courts of equity, and is expressly confined to suits at common law. *Parsons* v. *Bedford*, 3 Peters, 446. Nor does it inhibit the enlargement of the powers of courts of equity by competent legislative authority, so as to embrace matters which were formerly matters of common law jurisdiction.

2. But the provision of the constitution is not applicable to the state of things existing here when this court was established, when there was no established civil government here, and no Federal courts under the regular action of the Federal Government. As has been shown in the opinion of the majority of the court, this special court of equity was an emanation of military power, in the abnormal political condition in which the State was then placed; and it would appear, that the rules for the ordinary action of the Federal Government were not applicable to such a state of things. The right under consideration could have had no reference to a state of war or of military occupation, which was the condition of this State when this court was established. It did not apply when General Kearney was acting as governor of New Mexico, and organized a government there; nor when General Quitman was acting as governor of Mexico. The power to appoint such a governor is not reconcilable with the constitution, under the regular civil action of the government, and is justified solely on the ground of necessity, as a military act, of temporary duration, and in order to restore the regular establishment of the Constitution and laws of the United States in the State. The powers and acts of the provisional governor must be of the same character, and be tested by the same principles. Hence the military authority by which the provisional governor was appointed, and under

which he was acting, must do acts irreconcilable with the constitution and laws, during the period of temporary military occupation of the State; because, in such circumstances, the regular civil action of the government had become impracticable. Upon no other ground can either the appointment of the provisional governor, or any act done by him, be justified. Hence he was clothed with the extraordinary power which he. exercised in this instance, which must be presumed to have received the sanction of the President.

If, therefore, the view of the majority of the court—that the enlarged judicial powers conferred on Judge Swann, by the provisional governor, cannot be sustained because such powers are in conflict with the constitution—be correct, . the objection equally applies to the appointment of the provisional governor, and to his act in appointing Judge Swann, which must likewise be unconstitutional; and thus the argument would destroy the position taken by the majority of the court, that the appointments of the provisional governor and Judge Swann were valid. For, if the provisional governor had no power to confer extraordinary authority on Judge Swann, the President of the United States had, for the same reason, no power to appoint the provisional governor, without warrant in the constitution; and the whole fabric which has been erected on that appointment would fall. But if the extraordinary powers exercised by one be valid, so must those of the other; and, indeed, they both depend on the same principle—the necessity of the extraordinary measures as the means of restoring the Constitution and laws of the United States *by military authority*, and of restoring civil government in this State.

But whether this action of the provisional governor is valid or not, under the Constitution of the United States, I think it received the sanction of the State Convention, in August, 1865, and was adopted into our judicial system.

If that be true, it obviates the objection that the powers which, as I think, were conferred on Judge Swann by the provisional governor, were in violation of the Federal constitution, and void; because the provision of the constitution referred to is applica-

ble only to the courts of the Federal Government, and in its regular course of administration.

The language of the ordinance of the convention is as follows: "Be it ordained, that the special courts of equity heretofore, and that may be hereafter, established in this State by the provisional governor thereof, be and the same are hereby recognized to be in existence; but that, in all cases, the right and benefit of exceptions, bills of exceptions, writs of error, supersedeas and appeals from said court or courts, to the High Court of Errors and Appeals, for the revision and judgment of the latter court, shall be and are hereby secured to any party litigant in said court or courts as is now provided for," etc., for the chancery and circuit courts of the State; "and said Court of Errors and Appeals shall take cognizance and jurisdiction of such cases, as in case of appeal and writ of error from the chancery and circuit courts of this State: *Provided*, that such special courts, and the proceedings had therein, after the courts known to the constitution and laws of this State are established, shall not be recognized beyond the then unfinished and instituted business therein," etc.

Thus the Special Court of Equity, as it is denominated by the ordinance, is "*recognized to be in existence*," by the highest authority in this State; that is to say, it is recognized as existing as a legal court, and is made a part of our judicial system. This phraseology, it is true, is somewhat singular, as is the case in several other instances in the ordinances of that body; but its legal import is not to be mistaken. It recognizes the court as an established judicial tribunal, and of course adopts it with the powers appertaining to it as it was instituted; for the powers conferred on it would necessarily follow it, unless negatived or qualified by something in the ordinance; and there is nothing having such an effect in it. It provides for all steps necessary to connect it with this court, in the same manner as the regularly constituted courts, under the constitution.

It seems to me, this is manifestly a recognition of the court by the convention, as a legal court, with all the powers conferred on it by the provisional governor, as completely as if it

had been, in positive words, declared to be one of the regular courts of the State, for the time limited for its duration.

The fact that this ordinance was not incorporated into the amended constitution, as promulgated by the convention, whilst other amendments, made at the same time, were incorporated and published, does not show that this ordinance was not intended to have the full force of adopting this court as a legal tribunal of the State, for the period of its duration. For this ordinance expressly adopted the court only as a temporary measure, and for a short period; and the others referred to are amendments of a permanent character, affecting the general powers of the government.

I agree with the opinion of the majority of the court, as to the validity of the appointment of Judge Swann, and also with the opinion that, on the merits of this particular case, the decree should be reversed and the bill dismissed.